5065 ARGUETA v. Department of Health and Human Services Mr. Webb, when you are ready, you may begin. Thank you very much. I thank you for coming to Denver. Thank you for inviting us. May it please the court. Veronica Argueta's appeal is a simple one. She asked you to reverse the decision denying her son Joshua compensation under the Vaccine Act because the special master who denied Joshua compensation did not consider the testimony of Leonard Stabbe. Mr. Webb, you have in the opening brief a statement at page 19. The special master's discussion references Mr. Stabbe's testimony twice. Neither reference reflects consideration of Mr. Stabbe's testimony or articulates a rational basis for disregarding it. In the reply brief, you say the special master's changed three references to Leonard Stabbe's testimony that he observed a sudden change in Joshua's response to his environment after he received his DTAP vaccination. I went through and counted them. There were certainly at least three. There were, in fact, multiple references to Mr. Stabbe's testimony. Are you in your reply abandoning that brief argument that the special master only made two references? I apologize for the confusion on that. I went through preparing for this argument. I kept referring to when I counted them, I was usually referring to a specific kind of testimony. In other words, I think you should count them as their effects. In my reply brief, I was focusing exclusively on the references to the abrupt change. In my own, when I recounted them, it seems to me that three of those references are either general references or references that address the question of prior normal response of us. But he sure as heck considered it. I mean, you can't say he didn't. Well, you cannot say that the special master did not mention the Leonard Stabbe's testimony. The real question is whether mentioning is the same as considering. And I think that he analyzed it, did he not? Well, I mean, you go to the question of analyzing, and I don't think there's any indication in those references of an analysis of Leonard Stabbe's testimony. Didn't Mr. Stabbe say that he was unclear about when events occurred? And didn't the master mention that? The special master does mention that. Let's be clear on what that testimony was about. Mr. Stabbe explained that for months he had observed normal behavior in Joshua Arrueta, normal responsiveness. And then he explained that a time came when he observed an abrupt change from normal responsiveness to a very diminished responsiveness, to the point that Mr. Stabbe was concerned that Joshua was both deaf and blind. In his initial testimony, he said he didn't know when the vaccination was given. And then subsequent, I think, questioning from the respondent, from the secretary, he said something like, it happened within a couple days of the vaccination. So, there is a degree of uncertainty. Mr. Stabbe didn't know when the vaccination was given. That's what he said. And later on, he said that this abrupt change he described occurred within a few days of the vaccination. Now, lay that alongside the perhaps fortuitous fact that there's a physical examination already scheduled. I'm sorry, I didn't hear that. There's a doctor's examination already scheduled. It doesn't seem to be congruent to the vaccination. It just happens to have been scheduled at that point. Well, it was just two things collided, essentially. There was a diagnosis of the colobama, which simply means there's a deformity in the iris of the eye. Colobama can include other deformities, but Joshua's does not. That was discovered on the 25th of October. In the context of, by discovered, I mean noticed. It was always there. And by the time, and when Mrs. Arletta went to the emergency room, and then as instructed, followed up with a doctor on the colobama, she went for a second opinion on the significance of the colobama. And that doctor or nurse practitioner said, you really should come in and get your vaccinations. And at the same time he said you should really get your vaccinations, he scheduled this follow-up visit, which purely coincidentally occurred the day after the vaccination. And there's a reason we never argued that Mrs. Arletta brought Joshua into that appointment because of his change. Oh no, but you had a skilled medical practitioner doing an examination immediately afterwards. That's right. And showing no symptoms. And I'm sorry? And showing no symptoms. No reaction to the vaccine symptoms. Those are very important distinctions. He describes symptoms that quite closely match the regulatory definition of an acute encephalopathy. He didn't consider it an acute encephalopathy. And it appears that Mrs. Arletta did not tell him that these were new. Now, that goes to, is there evidence in this record to support the special master's findings? There is. But that does not permit her to disregard important relevant testimony. And I think you need to look at those references and decide whether they evidence consideration and include an articulated explanation for disregarding Mr. Stavey's testimony. I think if you believe that they reflect a consideration of Mr. Stavey's testimony, not just a mention of it, but a consideration of it, and if you think they articulate a reason for disregarding it, then you should affirm the matter. But it does not appear that the testimony was disregarded, as you say, like not considered at all. In fact, it's the opposite. It appears that the testimony was considered and weighed. Maybe it was minimized, or maybe it was given less credible weight, or maybe, as a special master says, that he didn't think that Mr. Stavey was credible because of the dates and some other factors. But are you arguing, and is it your position, that Mr. Stavey's testimony was completely disregarded? I mean, not considered at all? That's an interesting question. I don't know exactly what the special master did. It doesn't look to me like he considered it. The term that was used in the response in the government's brief was reasonably considered. I don't believe it was reasonably considered. Well, I mean, the fact that it was mentioned several times indicates clearly that it was considered. The extent to which it was considered, the extent it was considered persuasive is another question. But you can't say that it was ignored. It was there, and it was obviously recognized because it was mentioned. Well, that's getting over to the question of, I don't think mentioned equals consider. And for those relevant, and I don't know whether you find this as persuasive as I did, but it seems to me that when the special master got to explaining what she in fact considered what made a difference to her in her decision-making process, she said, I weighed the testimony and conduct of the petitioner with the testimony and conduct of the records and conduct of Dr. Weiss, and the expert witness testimony. That's her description of her evaluation of the testimony and whether there was an abrupt change. And in that description, there's no statement that she considered. There's no reference to Mr. Stabe's testimony that there was an abrupt change. Never was there an articulated reason. She never said she found Mr. Stabe's testimony unpersuasive, unreliable. There's no requirement that all of the reasoning be articulated in the opinion. If the evidence is sufficiently important, I think that the law does require the special master to articulate a reason for disregarding it. Aren't you really asking us to reweigh the testimony anew and to come out with a different decision than the special master? No, I'm not. I'm asking you to remand it to the special master and have her consider this evidence and articulate a reason why she didn't. I cannot argue that the special master could not read Mr. Stabe's testimony and explain why she found it unpersuasive. Had she done that, I wouldn't be here. Because you could find this testimony unpersuasive. She could have exercised her discretion to do so. But I don't think she did. I think if you read that, it really is a misdemeanor. So again, it seems to me your argument is that she didn't consider that testimony at all. Because you don't seem to be arguing that we would have the ability to overturn her analysis and weighing of the various pieces of evidence. You recognize that the special master is entitled to considerable deference, and it's not our position to reweigh the facts. Even if we might have a different view of those facts ourselves, that's not within our authority to do. So your argument has to be, and seems to me, is that she just didn't consider the evidence at all. Well, I don't think this, well. And it's hard for me to conclude that that's the case. I think that it is important that the law requires both that she consider the evidence and that she articulates the reason. And I think that given the significance of this evidence to the petitioner's testimony, she should have articulated why she found it unpersuasive. And she demonstrated in her opinion why she found Veronica Arletka's testimony unpersuasive. I don't think she needed to provide that level of explanation. But she could have said, she could have told us why the fellow who observed Joshua as an infant and saw a radical, dramatic change in his behavior, and came to court and testified about it, why his testimony didn't weigh at all in her decision. She could have given an explanation, but she didn't, I don't think. Thank you. All right, thank you. Let's hear from the government. Mr. Wishart. Good morning, Your Honor. Good morning. Please, the court, counsel. Based on the court's questioning, I can be brief. It's clear here, based on the record, that the special master did consider Mr. Staub's testimony. Did she come out specifically and state reasons one, two, three, why she did not find it to be credible or persuasive in this case? No, she necessarily didn't do that. But you can read by implication that she didn't find Mr. Staub's testimony standing alone to be enough to support the petitioner's theory here. And the petitioner's theory here was really based on which the special master didn't find credible either. I found that part interesting because we have an infant who had significant prenatal problems and who had problems that flowed from the activity of the mom during pregnancy and everything. And it's clear from the record that the child had significant problems and the child's going blind. And then we know the other problems. Now, Mr. Staub testified that when he picked up the child the day after the vaccine, that the child was lifeless. He said it's as if all recognition had left him and he was no longer there. So Mr. Staub's testimony seems to me to point to something that's radically different from the problems that were discussed before, you know, that constitute the child's medical record. You have a mom that's living with the Staubies. We have a 72-hour window, right? That's right. I mean, in a situation like this where you have a child that gets a vaccine, how are individuals like that, the mom and other adults that live around them, how are they to detect the effects of the vaccine within the 72 hours? I mean, it just seems unreasonable. If they took the child to the hospital, then perhaps Mr. Staubies' testimony would have been given greater weight. But he's testifying as a lay person who knows the child, knew him before the vaccine and after the vaccine, and he's testifying as to some symptoms that seem to me not to be related to the prenatal problems that the child had. And I think those problems, I think the problem with that is Mr. Staub, he did testify about different time periods. He said he wasn't sure when the vaccine occurred. He later said, well, it did occur close to the vaccine. But if you look at his testimony as a whole, Your Honor, it seems more appropriate that his testimony, when he was talking about Joshua being lifeless, that occurred later, when later in the month, almost a month later, when Joshua started to exhibit signs of seizure. And then when he was diagnosed later in late November, early December of infantile spasms. So I think based upon that, because here we have, as Judge Wallach indicated, the next day, unrelated really to this, but mom takes the infant Joshua to a pediatric ophthalmologist at Seattle Children's Hospital. He doesn't see any of this information. So based on that record, and based on the record as a whole, the special master made her find it. Did she come out specifically and say regarding Mr. Staub? On the following day when they took him to the pediatrician, I mean, that doctor was considering the health of the child with respect to all the prenatal problems. And I didn't get from the record that the doctor knew that the child had received a vaccination or anything else that would cause a doctor to see a separation between the symptoms that are onset as a result of the vaccination and the symptoms that existed because of the prenatal problems. But I think the importance of Dr. Weiss's examination here is the fact that he didn't see anything. Even if he didn't know that child had a vaccination, he didn't see anything that would indicate some type of acute encephalopathy going on in Joshua within 24 hours of vaccination. Could it be because he was viewing the child only through the lenses of the prenatal problems and doesn't see anything extraordinary different? I mean, we already know the child has significant problems. I don't think so. I think that the mom completed a pretty detailed questionnaire before Joshua was seen by Dr. Weiss. He's a pediatric ophthalmologist. Yeah, he was looking specifically for the pre-vaccination issue that came up, but there was nothing to indicate from the mom raising an issue that she saw some dramatic change in Joshua within, we're talking about really almost 24 hours. That's 24 hours later. And that was another reason why in terms of looking at Mr. Stabe's testimony regarding something happening within 24 hours of the vaccination, the special master looked at the evidence as a whole. I'm troubled by the case. A lot of the vaccine cases that come to us happen as a result of you have a healthy person, gets a vaccine, and then they have the onset of the symptoms or that preliminary onset. Here, we have a child who is obviously going to have significantly serious lifetime-threatening problems before they get the vaccination. And then the doctor looks at the child 24 hours after the vaccination. I just wonder if there's a sufficient division here. If the doctor knew that I have to look at things from that perspective or perhaps that the symptoms of the vaccination are hidden or obscured by these prenatal problems. Well, I understand your concern. I think we're getting beyond what the issue here is. I mean, the issue here is a very and that's really the only reason we're here. That's the only issue that's been raised on appeal and whether it was arbitrary and capricious. But we're looking at part of this de novo, aren't we? I think that the only issue before you is the issue of whether it was arbitrary and capricious for the special master and her consideration of Mr. Stabe's testimony. I mean, there were issues that were raised in the motion for review, but when this case was then appealed to this court, the issue was solely limited to whether or not her consideration of arbitrary and capricious. In terms of consideration, not only did she consider it, special master in this case also mentioned the fact that it looked at it from a way of whether or not it corroborated Petitioner's testimony about what happened during that 72-hour window, which was another reference in the record regarding her consideration of the testimony. It's clear from the record here that the testimony was considered. Did the special master's testimony go through factors that she looked at? No, but if you consider the record as a whole here, and that's not required. I mean, special master in the Vaccine Act is given broad discretion in terms of how she looks at the evidence and what evidence she considers. There's no requirement that she go through a laundry list of different things that she considered in order to make her finding. The other part of this is that Petitioner's own admissions and the briefing indicated that they thought that Mr. Stabe's testimony was equivocal as well. I mean, they talked about providing only modest support, the fact that he wasn't sure when the vaccination occurred. That's not the kind of evidence, standing alone, that would be considered substantial evidence in order to support some type of vaccine finding here, especially this quarter table encephalopathy, an acute type of incident occurring within 72 hours. There's no further questions we would ask as you affirm the Court of Federal Claims' decision affirming the special master. Thank you very much. Mr. Webb, you literally have the last word. Thank you. I want to say that the most important thing that Mr. Stabe's testimony addressed was whether there was ever an abrupt change in Joshua Arweta's condition. The whole, if you, the overall opinion from the special master is that there really wasn't ever an abrupt change. And so these very worrisome symptoms that were observed the day after the vaccination are attributed to some prenatal. Well, you're conflating that, though, when you say that they were, when you say they were observed, you mean Mr. Stabe's testimony, correct? No, I mean that Dr. Weiss saw these symptoms the day after the vaccination. Now, if, I think everyone agrees that if Joshua had been perfectly normal before he ever went, got that vaccination, that those symptoms would have been very serious indeed, and perhaps have satisfied the criteria for encephalopathy. That was the government's expert witness's testimony. So the question was, was there ever a change? Not just whether the change happened immediately after the, after the vaccination, because the determination that it didn't occur within the table time frame, the 72 hours, was based largely on the notion that there never was a change, never an abrupt, significant change. It seems that the special master did consider that very issue. And, and the problem was that, well, the special master found that Mr. Stabe's testimony not to be credible, not as to the abruptness of a change, but just that he couldn't pin down the dates. That was a problem with his testimony. What I'm saying is that he seems to have forgotten that he said there was an abrupt change, and that should have affected the question of both, was he normal before? And, I mean, it's as if he didn't testify on that critical point. And perhaps the final thing I want to say is that just with prior problems, and there was some dispute about how serious they were, alone wouldn't include the occurrence of encephalopathy. If the abrupt, if he had prior problems, and there were, even if there were problems in response, and he had an acute, dramatic change, then that would be the basis for encephalopathy, even if he had not been normal. Is there, is there any evidence in the record that would show that the problems related to the prenatal condition of the child would have delayed the onset of the, of the reaction to the vaccine beyond 72 hours? No. Okay. There is, there was testimony of evidence that, if, that prior problems could have made it difficult to recognize it. All right. I thank you. We have your argument. The case is submitted. I thank both counsel. And that concludes our session. All rise. We have adjourned until tomorrow morning at 10 a.m.